IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

NICHOLAS R. McATEE,

                       Plaintiff,                         OPINION AND ORDER

    v.

                                                18-cv-858-wmc

CHAPLAIN EWING,

                       Defendant.

While incarcerated at the Wisconsin Secure Program Facility ("WSPF"), *pro se* plaintiff Nicholas R. McAtee claims that a chaplain, David Ewing, violated his rights under the Free Exercise and Equal Protection Clauses of the United States Constitution by (1) denying him a kosher diet and (2) prohibiting him from wearing a yarmulke outside of his cell, unless attending congregate religious programming.  (Dkt. #10 at 8.)  Defendant Ewing has moved for summary judgment on both of plaintiff's claims (dkt. #19), which the court will grant for the reasons that follow.

PRELIMINARY MATTERS

Before turning to defendant's motion for summary judgment, the court must first address: (1) plaintiff's motion for leave to file a sur-reply (dkt. #37);[1]  (2) defendant's motion to strike the sur-reply (dkt. #43); and (3) defendant's unopposed motion for leave to file supplemental briefing in support of his motion for summary judgment (dkt. #47).

---

[1] Plaintiff captioned this motion as seeking an "extension of time" to file a sur-reply, but since no right to file a sur-reply exists without leave, the court construes it more accurately as a *request for leave to file* a sur-reply as well as supporting materials, including a reply to defendant's response to plaintiff's additional proposed findings of fact and plaintiff's second declaration in support of summary judgment.  (Dkt. #40, #41, #42.)

As an initial matter, the court will grant plaintiff leave to file a sur-reply, as well as defendant leave to file supplemental briefing on summary judgment.  Beginning with the latter motion, plaintiff interposed no objection to defendant supplementing his summary judgment brief with an argument that any request for injunctive relief to wear his yarmulke has been rendered moot in light of a 2021 policy change allowing inmates to wear yarmulkes outside of their cells even if not attending congregate religious programming.  Moreover, finding no prejudice to plaintiff the court must grant this motion.  In particular, "[a] court's power to grant injunctive relief only survives if such relief is actually needed," and the policy change has corrected the asserted violation.  *Nelson v. Miller*, 570 F.3d 868, 882 (7th Cir. 2009), *abrogated on other grounds by Jones v. Carter*, 915 F.3d 1147, 1149-50 (7th Cir. 2019); *see also League of Women Voters of Indiana, Inc. v. Sullivan*, 5 F.4th 714, 721 (7th Cir. 2021) ("a change in policy during the course of litigation may accord the plaintiffs full relief or deprive them of a legally cognizable interest").

Regarding defendant's opposition to plaintiff's proposed sur-reply, he simply argues that plaintiff did not have court permission to file one.  (Dkt. #43 at 2.)  In response, plaintiff correctly notes that defendant filed a response to plaintiff's additional, proposed findings of fact (dkt. #31), and the court's guide for *pro se* litigants allows for such a reply, at least to the factual response.  Regardless, in light of plaintiff's *pro se* status, the court has considered both parties' arguments and submissions as indicated below.

UNDISPUTED FACTS[2]

### A. Background

McAtee was incarcerated at WSPF from May 2017 until his release on extended supervision in May 2018.  Ewing, who was the WSPF chaplain at all times relevant to this case, retired that same month.

The Department of Corrections ("DOC") through its Division of Adult Institutions ("DAI") gives prisoners opportunities to pursue the lawful religious practices of their religion of choice.  To that end, the DAI administers religious accommodations and programming through inclusive Umbrella Religion Groups ("URGs") designed to appeal to a wide range of religious beliefs within a given faith community.  Currently, the eight URGs are Catholic, Eastern Religions, Humanist/Atheist/Agnostic, Islam, Judaism, Native American/American Indian, Pagan, and Protestant/Other Christian.   A prisoner's designated URG generally determines the religious services or study groups that prisoners in that URG may collectively attend, as well as provides guidance as to the religious property and dietary accommodations those prisoners may require.

---

[2] Unless otherwise noted, the following facts are material and undisputed.  Consistent with its practice, the court has drawn these facts from the parties' proposed findings and the cited evidence of record, viewed in a light most favorable to McAtee.  *Miller v. Gonzalez*, 761 F.3d 822, 877 (7th Cir. 2014) ("We must . . . construe the record in the light most favorable to the nonmovant and avoid the temptation to decide which party's version of the facts is more likely true.").

On January 7, 2018, McAtee changed his religious preference to Judaism.[3]  Before that, McAtee had reported varied religious preferences, including Pagan in September 2016, and Protestant/Other Christian in March 2016.  Regardless, in 2018, DAI Policy 309.61.02 allowed McAtee and other Jewish inmates to wear a yarmulke, but only while attending congregate religious programming or in their cells.  The policy limited head covering use due to security concerns with displaying religious items that could also serve as identifiers for gangs or security threat groups, as well as facilitate violent gang and group activity or cause inmate-to-inmate assaults or battery.

While the use of the yarmulke was still limited to certain areas within WSPF until recently, Muslim inmates could wear a kufi cap in common areas beyond those specified in DAI policy as a condition of a 2016 settlement agreement.  Chaplain Ewing was required to follow the terms of that agreement, but was not involved in discussions about it.  He also lacked the independent authority to allow inmates of other religions to wear their approved head coverings outside of their cells when not at congregate religious programming.  Apparently recognizing the conflict in particular, however, DAI updated its policy effective June 28, 2021, to allow inmates to wear approved religious head coverings in common areas at all DAI institutions, including yarmulkes.  (Dkt. #48 at 1, #48-1 at 4.)

---

[3] Ewing disputes McAtee's assertion that despite having designated other URGs in the past, he had "always strongly believed in the Jewish faith."  (Dkt. #28 at 1.)  In support, Ewing notes that as recently as 2016 McAtee received a conduct report for vandalizing his own cell with white supremacist drawings and symbols, including a swastika.  (Dkt. #34-2.)  At that time, McAtee admits he was a member of the Aryan Brotherhood, but claims he had a change of heart after this incident.  (Dkt. #40 at 2.)  However, Ewing does not claim that he was aware of McAtee's former supremacist beliefs in 2018 when he addressed McAtee's yarmulke and kosher diet concerns.

Similarly, the DOC has adopted a set of accommodations for those inmates whose sincerely held religious beliefs require that they abstain from certain foods served as part of the general fare menu at DAI institutions.  Generally, inmates can either self-select foods from the general diet or request one of three, DOC standard religious diets:  halal, kosher, and plant based.  As applicable here, the kosher dietary accommodation is available to inmates who have selected the Judaism URG, which is intended to conform to the strictest interpretation of the religion's dietary laws.  For example, consistent with Jewish dietary law, the DOC requires its kosher diet be prepared using specific slaughtering and food preparation processes, serving meat and dairy separately, and avoiding pork or shellfish.[4] However, the degree to which an *individual* inmate actually follows these dietary laws can vary greatly, depending on that individual's beliefs, practices, and personal preferences.

Each institution's chaplain is responsible for reviewing a religious diet request.  The chaplain may conduct an informal interview with the inmate to assess eligibility based upon the inmate's sincerely held religious beliefs.  As part of the interview, the chaplain may ask the inmate to give examples of prohibited foods or special handling procedures, or to cite religious tenets supporting specific dietary practices.  As Chaplain Ewing attests, this is in part to determine if the inmate's religious requirements could not be met through the general fare menu and a change of diet was truly necessary.  (Dkt. #22 at 4, #33 at 2.) Chaplain Ewing also generally sought to ensure that the inmate would be successful on the

---

[4] Also, because Wisconsin prisons do not have kosher kitchens, they follow Academy of Nutrition and Dietetics guidelines for serving kosher meals in non-kosher commercial kitchens, including prohibiting non-kosher foods, serving dairy products only with meatless meals, preparing kosher meals separately from all other meals, using disposable cookware and serving containers, or serving unopened kosher-certified, pre-packaged entrees.

5

requested diet, because inmates approved for a religious diet are expected to comply with it, including for canteen purchases. (Dkt. #22 at 5.) Generally, staff must also monitor inmates to ensure compliance, and inmates may be removed from a special religious diet if found to have violated its dietary tenets twice in six months. Accordingly, these diets require additional administrative resources and impact kitchen staff, as well as the inmate.

If the chaplain denies an inmate's special diet request, the inmate can appeal, but unless successful must wait six months before submitting a new religious diet request. Chaplain Ewing also attests that if an inmate did renew his dietary request six months later, Ewing took that persistence as a sign of sincerity of belief. (Dkt. #22 at 7.) According to Kelli Willard West, the DAI's Religious Practices Coordinator, the DOC has a legitimate interest in limiting prisoners' ability to go on and off religious diets at will; hence, the requirement that prisoners wait six months to renew a request for a religious diet that has been stopped.

Specifically, West avers that consistency in religious diets furthers orderly and efficient food services for the DOC's population of 23,000 prisoners across 36 facilities. Beyond pointing out the large inmate population, West explains that the DOC's food service operations are ill-suited for restaurant-type food preparation and accommodations. While restaurants can cater to individual requests because they use a variety of small-scale pieces of equipment for food preparation, the DOC's food service operations are more complex, in large part due to the DOC's unique security concerns, which require: criminal background checks for all food vendor delivery staff; large-sale, high efficiency, tamper-proof equipment; secure food storage areas; and food deliveries at 1-4 week intervals, each

6

of which require inspections for contraband and stowaways.

Thus, attests West, if the DOC changed its approach to allow at-will changes to diets, the DOC would also need additional food service staff, different equipment, and more deliveries, which, in turn, would require more security staff and procedures.  An additional complication is that DOC food service operations are staffed by workers and prisoners who often are untrained, may not read well, *and* require both continual supervision and frequent retraining.  Allowing for frequent, individual meal adjustments would also add another layer of training and supervision, which could also lead to mistakes, a food-borne illness outbreak or lower efficiency.  West further opines that allowing for restaurant or a la carte service would require more time and resources, which simply is not feasible in an institutional setting that operates on a strict timetable.

For all those reasons, West attests that the DOC interest in orderly prison administration is furthered by ensuring that prisoners are granted access to religious diets only if they demonstrate it fulfills a sincerely held religious belief.  West also explains that this policy supports consistency within the prison system, because prisoners are less likely to withdraw from a genuine religious diet.  In the past decade, however, West attests that the DOC has experienced an increase in religious diet requests, some of which are made for non-religious reasons.  This has unnecessarily burdened the DOC by increasing costs and inefficiencies without a countervailing benefit.  For example, West claims that prisoners have asked chaplains to put them on a religious diet for non-religious purposes, including health, weight loss, fear of food tampering, or to drive up costs to protest kitchen procedures.  West explains that this trend of so-called "insincere diet requests" has

7

burdened the DOC's food service by inappropriately increasing costs and increasing the fluctuation in religious diet numbers.

Finally, again according to West, if an inmate wants to be considered for an individual religious accommodation not currently allowed by DAI policy, he or she can submit a Request for New Religious Practice form (or "form DOC-2075") to the chaplain at their facility. The chaplain and the chaplain's supervisor each review this form, make their recommendations, then forward the request to the DOC's Central Office. At that point, the DOC's Religious Practices Advisory Committee ("RPAC") conducts another thorough review, including any necessary research, before making its recommendation. Based on the cumulative record of the prisoner's request and the recommendations by the chaplain, supervisor and RPAC, the institution's warden makes the final decision on the inmate's request. This process allows for one accommodation request per form, but there is no limit to the number of requests an inmate can submit over time.

### B. McAtee's Request for a Kosher Diet

On January 18, 2018, approximately a week after changing his religious preference to Judaism, McAtee submitted a religious diet request form. (Dkt. #1-1 at 7.) On it, he indicated that he was requesting a kosher diet and that he practiced Judaism, but left blank the section that asks him to explain the specific dietary accommodations he was requesting, including relevant religious tenets. McAtee attests that he did not elaborate further regarding the specific dietary accommodations he needed because there are not "different types" of kosher diets and WSPF offered a one type of kosher meal. (Dkt. #28 at 2.) However, Ewing attests that he expected sincere inmates to include such details in their

requests, and this was a necessary component for his deciding whether the general fare menu could meet an inmate's religious dietary needs.  (Dkt. #33 at 2.)

Ewing came to McAtee's cell to interview him about his dietary request on January 22, 2018, although the parties dispute the content of the interview.  Ewing attests that he "likely asked" McAtee about his religious preference history, what he knew about Jewish dietary laws, what religious materials McAtee had studied, and if he knew what it meant for food to be kept kosher.  (Dkt. #22 at 5.)  Regardless, the chaplain recalls that McAtee "was not able to answer all questions correctly."  (Dkt. #22 at 5.)  In contrast, McAtee contends that Ewing only asked him "what I knew about the Jewish religion" and "what Passover was about," and specifically asserts that he answered these questions correctly. (Dkt. #28 at 2.)  For example, McAtee attests to telling Ewing that Jews "believe in one god and in keeping kosher," and that Passover "was to celebrate the Israelites exodus from Egypt."  (Dkt. #28 at 2.)  However, McAtee attests that Ewing nonetheless told him he was not sincere, did not know enough about Judaism, and was "lying" about being Jewish, prompting the two to get "into a heated argument," with McAtee threatening to sue Ewing. (Dkt. #28 at 2-3.)

After the argument died down, McAtee recalls Ewing telling him that he could still eat general fare meals.  Similarly, Ewing attests that he "likely determined that self-selecting from the general fare menu was appropriate for [McAtee's] beliefs at that time" particularly after his allegedly incorrect answers to Ewing's questions.  (Dkt. #22 at 5.)  Again, in contrast, after asking Ewing which items on the general fare meal trays were kosher, McAtee recalls Ewing instructed him to avoid all the meat items and indicated that he

would be approved for a kosher diet after six months if he successfully complied with those instructions. Ewing further attests to advising McAtee specifically regarding *pork*, stating that he could still eat general fare meals because they never included pork items. (Dkt. #33 at 3.) Regardless, McAtee attests that it was then that he told Ewing it would be impossible for him to wait and self-select kosher foods from the general diet for six months, since he could not reapply for a kosher diet because he was scheduled for release before then. (Dkt. #28 at 3.)

Whatever happened during their meet and confer, there is no dispute that Ewing formally denied McAtee's request, noting on his religious diet request form that McAtee "may self select."[5] (Dkt. #32-2 at 7.) Ewing attests that he also denied McAtee's request because his conversion to Judaism was so recent *and* he had changed his religious designation repeatedly in the past. McAtee alleges that self-selecting kosher foods from the general fare menu as Ewing suggested would have meant missing half his daily allotted calories, but Ewing disagrees. In response to McAtee's follow-up note asking Ewing for "the requirements to be put on a kosher diet," Ewing told McAtee that he could reapply in six months. (Dkt. #1-1 at 6.) However, as McAtee allegedly predicted during the interview, he was released onto extended supervision before then.

Further, although McAtee alleges that he sent Ewing a DOC-2075 form on February 1, 2018 -- requesting a religious dietary accommodation within two weeks after his first

---

[5] Although Ewing denied McAtee's request for a kosher diet, he approved McAtee's participation in the Passover feast. Ewing attests that this is because he did not have the discretion to deny an inmate's timely request to participate in his designated URG's annual congregate meal. When McAtee wrote to Ewing asking why he was denied a kosher diet yet approved for the Passover meal, Ewing responded simply, "that happens sometimes." (Dkt. #1-1 at 5.)

request and just days after its denial -- there is no record of McAtee having done so.  Nor did McAtee reference submitting such a request in his subsequent April 2018 inmate complaint purporting to contest the diet denial, which was dismissed on the ground that he had failed to submit a DOC-2075 form to the chaplain first.  (Dkt. #32-2 at 4.)  McAtee did not appeal the dismissal.

### C.  McAtee's Correspondence about a Yarmulke

In addition to requesting a kosher diet, McAtee submitted correspondence about the use of a yarmulke.  In an undated information request to Chaplain Ewing, McAtee asked, "Am I allowed to wear a yamakah [sic]?" to which Ewing responded, "in cell or service only."  (Dkt. #1-1 at 4.)  In April 2018, McAtee sent two, additional information requests to nondefendants, each noting that he had been told he could not wear his yarmulke outside his cell and asking whether this was true.  (Dkt. #1-1 at 2-3.)  Consistent with Ewing's response, these individuals confirmed he could not.

McAtee now claims he also submitted a DOC-2075 form to Ewing requesting to wear a yarmulke outside of his cell, but did not allege this in his complaint.  (*See* dkt. #1 at 2, #28 at 3.)  Moreover, there is no record of McAtee submitting a DOC-2075 form or an inmate complaint regarding his wearing a yarmulke outside his cell.  Nevertheless, McAtee claims that Ewing did not process either his diet or yarmulke DOC-2075 form in retaliation for McAtee threatening to file a lawsuit against him, and Ewing disputes this assertion.

11

OPINION

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, then to survive summary judgment, the non-moving party must provide evidence "on which the jury could reasonably find for" non-movant. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-407 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (brackets omitted). During summary judgment, disputed facts are viewed in a light most favorable to the plaintiff as the non-moving party; however, this treatment does not extend to inferences supported merely by speculation or conjecture. *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017); *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 345 (7th Cir. 2019).

Plaintiff claims that defendant violated his rights under the First and Fourteenth Amendments by enforcing a policy prohibiting Jewish inmates from wearing yarmulkes outside their cells when not at congregate religious programming, and his First Amendment rights by denying his request for a kosher diet.[6] Defendant is seeking summary judgment in his favor on these claims, and alternatively, asserts entitlement to qualified immunity on plaintiff's kosher diet claim. The court will take up these issues in turn.

---

[6] In his opposition brief, plaintiff argues that he is also entitled to relief under the Religious Land Use and Institutionalized Persons Act and the Establishment Clause, and under the Equal Protection Clause for the denial of a kosher diet. (Dkt. #25 at 8-11, 14-15.) However, the court did not grant plaintiff leave to proceed on any of these claims in this lawsuit (*see* dkt. #10 at 8), and therefore, will not address them.

## I.  Defendant's Personal Involvement in Plaintiff's Yarmulke Requests

To begin, defendant asserts a lack of personal involvement in the alleged deprivation underlying plaintiff's free exercise and equal protection yarmulke claims.  Any claim of "individual liability under § 1983 requires personal involvement in the alleged constitutional violation." *Minix v. Canarecci*, 597 F.3d 824, 833-34 (7th Cir. 2010).  Here, plaintiff alleges that WSPF adopted a policy that prohibited him from wearing his yarmulke outside his cell except when participating in congregate religious programming, while Muslim inmates could wear their kufi caps in common areas without restriction under the terms of a settlement agreement.  Although there is no dispute that the defendant, Chaplain Ewing, had to enforce this policy, at least until recently, his involvement in plaintiff's alleged deprivation goes no further on this record than responding to plaintiff's request for *information* about whether he could wear a yarmulke at WSPF.  Specifically, plaintiff's information request to defendant asked whether as a general matter he was allowed to wear a yarmulke, not whether he could wear it in a certain area or why he could not, *or* be excepted from policy, nor argue that he should have the same privileges as Muslim inmates.  Thus, in responding, defendant simply gave plaintiff the information requested, but defendant did not deny a formal accommodation request or have any basis to infer from plaintiff's question that he was seeking an accommodation.  Moreover, although plaintiff made more specific inquiries about the limited use of head coverings in other information requests, the record establishes those were reviewed by nondefendants.

Now, plaintiff attests that he also submitted a DOC-2075 form *to defendant*

requesting an accommodation concerning yarmulkes, and he speculates the reason there is no record of this form is because defendant failed to process it in retaliation for plaintiff's threat to sue.  First, plaintiff raised no such allegations in his complaint.  *Cf. Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) ("[A] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.") (internal quotations omitted)).   Second, plaintiff still provides no details regarding the *contents* of this purported form, *when* he submitted it, *or whether he followed up* in any way after receiving no response.  (*See* dkt. #25 at 6-7, #28 at 3, #42 at 5-6, 13.)  Third, there is *no* record of plaintiff having submitted a DOC-2075 form concerning this issue, nor is there record of him submitting an inmate complaint about it.  (Dkt. #32-1 at 1.)  As previously noted, the court cannot draw inferences for plaintiff that are supported only by speculation or conjecture.  *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 345 (7th Cir. 2019). Accordingly, defendant is entitled to summary judgment on plaintiff's yarmulke claims for lack of proof of defendant's involvement in the alleged denial.

## II.  Plaintiff's Request for a Kosher Diet

As for defendant's alleged unlawful refusal to provide a kosher diet, to survive summary judgment on this free exercise claim, plaintiff must "submit evidence from which a jury could reasonably find that the defendant[ ] personally and unjustifiably placed a substantial burden on his religious practices."  *Neely-Bey Tarik-El v. Conley*, 912 F.3d 989, 1003 (7th Cir. 2019) (quoting *Thompson v. Holm*, 809 F.3d 376, 379 (7th Cir. 2016)).  "A substantial burden 'puts substantial pressure on an adherent to modify his behavior and to violate his beliefs.'"  *Id*. (quoting *Thomas v. Review Br.*, 450 U.S. 707, 718-18 (1981)); *see*

14

*also Holt v. Hobbs*, 574 U.S. 352, 361 (2015) (defining "substantial burden" as something that "seriously violates [one's] religious beliefs," regardless of whether alternative means of religious exercise are available).  Even then, a burden is justified when it is "reasonably related to a legitimate penological interest." *Turner v. Safley*, 482 U.S. 78, 89-91 (1987)).

### A.  Substantial Burden on Plaintiff's Religious Practices

As an initial matter, the parties dispute whether this record is sufficient for a reasonable jury to find that plaintiff's religious practices were substantially burdened by denying him a kosher diet for the six months after his initial request.  Plaintiff argues that in effectively conditioning the grant of his dietary request on plaintiff having to first self-select from the general fare menu for six months, the defendant, Chaplain Ewing, forced him to choose between forgoing adequate nutrition or violating his religious beliefs.  The Seventh Circuit has "repeatedly held that forcing an inmate to choose between daily nutrition and religious practice is a substantial burden." *Thompson*, 809 F.3d at 380; *see also Hunafa v. Murphy*, 907 F.2d 46, 47 (7th Cir. 1990) (reasoning that failure to ensure that preparation of meals kept pork separate from other food substantially burdened a Muslim prisoner's religious practice because it forced him to "an improper choice between adequate nutrition and observance of the tenets of his faith").

Still, there are substantial evidentiary gaps in this record beginning with whether plaintiff even tried self-selection and how it affected him, or how strictly he was following

Jewish dietary laws, if at all,[7] and what his daily calorie and nutritional requirements were, leaving a jury to speculate as to whether the general fare menu would have been nutritionally adequate while meeting his religious requirements.  For example, plaintiff asserts that forgoing all meat, as defendant was purported to suggest, would have left him with only approximately half of an inmate's daily allotment of 1,500 calories per day -- but he does not explain how he reached that number or on what evidence it is based.  (Dkt. #27 at 3-4, #28 at 3.)

For his part, defendant relies on the WSPF menus from January 1 through May 31, 2018, to prove generally that they "show only a small percentage of calories come from meat on any given day."  (Dkt. #29 at 6, #36-1.)  If anything, plaintiff argues that these menus support his position, but offers the sole example of the January 1, 2018, noon meal, which he notes would have cost him 362 of the 822 calories if pizza and the corn chips are also removed, neither of which are meat items.[8]  (Dkt. #36-1 at 1.)  On this record then, the court has substantial doubts the plaintiff has created a genuine issue of material fact concerning whether plaintiff's self-selection from the general fare menu would have resulted in an inadequate diet nutritionally or otherwise substantially burdened him.  *Cf. Tatum v. Meisner*, No. 13-cv-44-wmc, 2016 WL 323682, at *2 (W.D. Wis. Jan. 26, 2016)

---

[7] From plaintiff's description of his interview with defendant, it appears that their discussion concerned meat items.  (Dkt. ##25 at 13, 28 at 3, 42 at 10.)  In reply to defendant's response to his proposed additional findings of fact, plaintiff moves the goalposts by suggesting that he also avoids items that mixed dairy and meat together, but it is unclear whether that was true in 2018, and there is no evidence that defendant knew that at the time he was considering plaintiff's request. (Dkt. #42 at 11.)

[8] Defendant also notes that plaintiff purchased non-kosher canteen foods, which he could have used to supplement his general fare diet with, while plaintiff responds that he used those items purely as currency and gifts, rather than consume them.

(at the time of plaintiff's dietary request, the standard DOC diet provided more calories than the daily value requirements, "allowing inmates to obtain sufficient calories even while declining to consume some items").

### B. Defendant's Denial Was Reasonably Related to Legitimate Penological Interests

Even if plaintiff could show a substantial burden on his religious exercise, however, defendant prevails under the *Turner* analysis.  As noted, a substantial burden on an inmate's free exercise rights may still be justified if "reasonably related to a legitimate penological interest."  *Turner*, 482 U.S. at 89.  In evaluating whether a challenged regulation or restriction is reasonably related to a legitimate penological interest, courts analyze the four factors established in *Turner*:  (1) whether there is a "valid, rational connection" between the restriction and a legitimate government interest;  (2) whether the prisoner retains alternatives for exercising the right to free exercise of religion;  (3) the impact that accommodation of the right will have on prison administration;  and (4) whether there are other ways that prison officials can achieve the same goals without encroaching on the prisoner's right.  *Id*. at 89-91.

Importantly, "[c]ourts have acknowledged that these factors tend to blend together and are not meant to be weighed according to any precise formula."  *Kaufman v. Schneiter*, 524 F. Supp. 2d 1101, 1108-09 (W.D. Wis. 2007) (collecting cases).  Where "there is only minimal evidence suggesting that a prison's regulation is irrational, running through each factor at length is unnecessary."  *Mays v. Springborn*, 575 F.3d 643, 648 (7th Cir. 2009).  Moreover, in weighing these factors, the court "must accord substantial deference to the

professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). Finally, although "the burden of persuasion is on the prisoner to disprove the validity of a regulation," prison officials "must still articulate their legitimate governmental interest in the regulation" and provide some evidence supporting their concern. *Van den Bosch v. Raemisch*, 658 F.3d 778, 786 (7th Cir. 2011).

## 1. Rationally Related to a Legitimate Governmental Interest

The court begins with the first factor, often referred to as a "threshold" that can be dispositive for either party. *Singer v. Raemisch*, 593 F.3d 529, 534 (7th Cir. 2010) ("The four factors are all important, but the first one can act as a threshold factor regardless which way it cuts."). Defendant indicates that his denial of plaintiff's initial request for a kosher diet was grounded on the need to limit the provision of religious diets to prisoners with a sincerely held need for them, and with an understanding of what the diet would require. Undoubtedly, prisons have a legitimate interest in orderly, cost-effective food service, including the administration of religious diets, and there is a rational connection between that interest and the DOC's policy limiting religious meals to inmates whose sincerely held religious beliefs require them. *See Koger v. Bryan*, 523 F.3d 789, 800 (7th Cir. 2008) ("orderly administration of a prison dietary system, and the accommodations made thereunder, are legitimate concerns of prison officials"); *see also Vinning-El v. Evans*, 657 F.3d 591, 594 (7th Cir. 2011) ("A prison is entitled to ensure that a given [dietary] claim reflects a sincere religious belief . . . "); *Akbar v. Overbo*, No. 17-cv-442-slc, 2019 WL

18

6699743, at *8 (W.D. Wis. Dec. 9, 2019) (the need to limit the provision of religious diets to prisoners with a sincerely-held need for them is rationally related to the DOC's goal of providing orderly food service).  Here, in particular, DAI's Religious Practice Coordinator Willard West thoroughly and persuasively describes without dispute both the security and quality control challenges the DOC faces in providing daily meals to all its prisoners, and the challenges to its daily food operations were prisoners allowed to modify their diet at will.

On this record, plaintiff has failed to offer sufficient evidence to create a genuine issue of material fact that the denial of his first request for a kosher diet was not reasonably related to this legitimate DOC interest.  How strictly a Jewish inmate follows kosher dietary laws can vary, so the chaplain reasonably relied on information from the inmate himself to determine what his dietary and religious needs were and whether those needs could be accommodated in light of legitimate institutional and administrative interests.  First, plaintiff's request for a kosher diet came on the heels (just one week) of his reported conversion to Judaism, itself after rapid conversions to Christianity and Paganism within the two previous years.  To Chaplain Ewing's credit, he did not find this alone to be disqualifying but it reasonably left questions in defendant's mind as to the sincerity of plaintiff's sudden about face.  Second, when prompted on his dietary request form to explain what accommodations he needed, and any religious tenets underlying them, plaintiff chose to leave the section entirely blank.  (Dkt. #1-1 at 7.)  Although the parties dispute exactly what defendant asked plaintiff during the follow-up interview, and whether plaintiff's responses were correct, most material is plaintiff's undisputed failure to elaborate

on his dietary requirements beyond stating that being Jewish meant "keeping kosher" and avoiding non-kosher meat.  (Dkt. #42 at 3.)  While plaintiff asserts that no further detail was necessary because WSPF served only one kind of kosher meal, a kosher diet is not, as plaintiff puts it, "self-explanatory."  (Dkt. #25 at 3.)  Indeed, Jewish inmates do not all strictly follow all dietary laws, so plaintiff's unwillingness or inability to elaborate on his beliefs was reasonably enough, another red flag as to both the scope and the sincerity of his recently adopted beliefs.  Third, defendant had a right to weigh these concerns against the legitimate institutional and administrative concerns of the institution in changes to general diets.  Certainly, at minimum, defendant acted reasonably in taking all of this information in reaching a decision as to whether plaintiff's religious diet request was made sincerely and whether plaintiff might actually succeed on a kosher diet.  Similarly, defendant acted reasonably in weighing those concerns against the legitimate practical safety and cost efficiency concerns of the larger institution if inmate diets were too easily changed.  On this record, the court does not believe a reasonable jury could second guess Chaplain Ewing's balancing of plaintiff's and the institution's needs.

### 2.  Alternative Means

As for the second factor, there is no dispute that plaintiff had other ways to practice his Jewish faith.  For example, he could engage in individual study and personal meditation, the use of religious books and property, celebrate annual religious meals and observances, correspond with fellow believers, visit with a Rabbi, and request to abstain from work or programing on religious days of observance.  *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 352-53 (1987) (explaining that although prisoners on work detail are unable to attend

20

Jumu'ah services, they can still participate in other Muslim ceremonies and practices).  As discussed, to the extent, plaintiff specifically argues that keeping kosher through self-selection was not feasible because it would have meant that only half of his weekly allotted calories would have been available for him to eat (dkt. #25 at 6-7, 13), plaintiff has not submitted evidence for a reasonable jury to find this caloric deficit, beyond asserting that he would have lost 362 of the 822 calories available on a single noon tray menu during the relevant six-month period.  Although WSPF menus are in the record, it remains unclear even at summary judgment what food items plaintiff would have avoided based on his sincere beliefs and understanding of keeping kosher.  *See AA Sales & Associates, Inc. v. Coni–Seal, Inc.,* 550 F.3d 606, 612-13 (7th Cir. 2008) ("As we have often observed, summary judgment is the 'put up or shut up' moment in the life of a case.").

    For that reason, on this record, a reasonable jury would again have trouble faulting defendant's choice of self-selection to be appropriate for an initial six-month period when presented with plaintiff's original request.  Even discounting plaintiff's failure to articulate his own beliefs and needs to defendant, there is no dispute that the DOC's kosher meals complied with the *strictest* interpretation of Jewish dietary laws.  Plaintiff has also failed to undermine defendant's own experience with many Jewish inmates at WSPF successfully self-selecting because they were only concerned with avoiding pork, which WSPF did not include in its general fare meals, and with some Jewish inmates being unable or unwilling to stick with a strict kosher diet after being switched.  Finally, even assuming plaintiff had a sincere belief and need for a stricter, kosher diet, and suffered physically while self-selecting for six months, there is *no* evidence that he ever told defendant about his concern

21

or specified to defendant what foods he would not eat beyond non-kosher meat.  (*See* dkt. #42 at 3-4, 10.)  Instead, *plaintiff* attests that he indicated to defendant during their interview that self-selection for six months was not possible because he would be released before then.  (Dkt. #28 at 3.)  As such, while plaintiff now attests that it would have been a challenge for him to maintain a kosher diet through self-selection due to nutritional concerns, he has not submitted any evidence indicating that defendant had reason to believe self-selection was not an adequate method for plaintiff to follow his religious diet until his release.  Thus, this factor, too, weighs against plaintiff.

### 3.  Adverse Impact of Accommodation

The third and fourth factors are closely related in this case.  As for the impact of granting his dietary request, plaintiff argues that any burden would have been minimal because food services already prepare many kosher and other special meals every day at WSPF.  (Dkt. #25 at 10-12.)  However, this is beside the point:  defendant is not arguing that the DOC could not have prepared one more kosher meal for plaintiff.  Rather, defendant argues that the DOC's large-scale food service operations would be hindered without the consistency and predictability that comes in part with "ensuring that inmates are only on religious diets if they demonstrate a sincerely held religious belief supporting their need for the diet," and are, therefore, more likely to understand the dietary requirements.  (Dkt. #20 at 22.)  Moreover, there is no dispute that a fluctuating number of inmates on a religious diet requires more staff resources to monitor and counsel those inmates for dietary compliance, and increases the likelihood of staff error and inefficiencies in distributing meals.

22

Finally, plaintiff has not submitted any examples of prisoners who the defendant specifically, or even the DOC generally, determined did not have a genuine religious need for a kosher diet, or who were unprepared to maintain it, but still received it. Accordingly, plaintiff has not shown that making an exception for him would not adversely affect the DOC's interests in consistent and efficient food service, and in accommodating only sincerely held religious beliefs, nor that he was not treated equally to his fellow inmate as a matter of policy *and* practice.

### 4. Obvious Alternatives to the Denial

Relatedly, the obvious alternative to the denial of plaintiff's request for at least six months would have been for defendant to have made an immediate exception for him despite finding him to be insincere and likely to waffle in his commitment to a strict kosher diet. As noted, however, defendant has made a convincing case that "providing diets without considering sincerity would hinder Food Services' operations," as would approving all religious diets regardless of whether the inmate seemed likely to succeed on it. (Dkt. #20 at 24.) Because plaintiff neither disputes that there has been a recent rise in insincere religious diet requests, nor that "maximizing inmate success in following the religious diet" furthers orderly and efficient food services (dkt. #30 at 35-38), allowing such an exception would set a problematic precedent. This factor therefore weighs against plaintiff as well.

While the court gives the most weight to the first *Turner* factor, since the remaining factors also weigh against plaintiff, the court concludes that defendant is entitled to summary judgment in his favor on plaintiff's First Amendment kosher diet claim.

23

### C. Qualified Immunity

As a fallback argument, defendant contends that he is entitled to qualified immunity. This doctrine shields officials from civil liability provided their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known at that time. *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation omitted). A clearly established right is one where "every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). The inquiry is two-fold: "(1) whether the facts, taken in the light most favorable to the plaintiff[ ], show that the defendants violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Gonzales v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009).

Whether a right was "clearly established" is grounded in the notion of fair notice. The Seventh Circuit recently reminded courts that "clearly established law cannot be framed at a 'high level of generality'," so courts must "[f]rame the constitutional right in terms granular enough to provide fair notice" to defendants that their actions violate a clearly established right. *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Thus, a right is "clearly established" only if it is found in Supreme Court precedent, controlling circuit authority, or "a consensus of persuasive authority such that a reasonable [party] could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999).

Here, defendant argues it had yet to be clearly established in 2018 that denying plaintiff a kosher diet based on a reasonably perceived lack of sincerity violated his First

24

Amendment rights.  Plaintiff has not responded to defendant's argument, let alone directed the court to a decision by the Supreme Court or the Seventh Circuit clearly articulating and upholding this right.  *See Vinning-El,* 657 F.3d at 593 ("Sincere religious beliefs must be accommodated (at least when failure to accommodate a particular belief would amount to discrimination against one sect, or a personal faith), but non-religious beliefs need not be").  As discussed above, defendant also had a good faith basis to conclude that plaintiff was unlikely to continue with a kosher diet successfully, either due to a lack of understanding of the diet or lack of sincere desire to participate in it.  If that conclusion was in error, as plaintiff contends, then defendant's mistake was reasonable in light of the information available to him at the time.  *See id.* at 594 ("Immunity protects public employees who make reasonable errors in applying even clearly established law");  *see also Malley v. Briggs*, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").  Defendant is, therefore, entitled to qualified immunity as to plaintiff's First Amendment kosher diet claim.  *Cf. Akbar*, 2019 WL 6699743, at *10 (granting qualified immunity to chaplain where plaintiff did not present any relevant authority clearly establishing a First Amendment right to repeatedly stop and start a religious diet at will).

For all these reasons,

ORDER

IT IS ORDERED that:

1) Plaintiff Nicholas McAtee's motion to file a sur-reply (dkt. #37) is GRANTED, and defendant's motion to strike plaintiff's brief in sur-reply (dkt. #43) is DENIED.

2) Defendant's motion for leave to file supplemental briefing in support of his motion for summary judgment (dkt. #47) is GRANTED.

3) Defendant's motion for summary judgment (dkt. #19) is GRANTED.

4) The clerk of court is directed to enter final judgment in favor of defendant and to close this case.

Entered this 30th day of August, 2021.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

26